UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| WESLEY G. WOODS,<br><br>    Plaintiff,<br><br>v.<br><br>ILLINOIS DEPARTMENT OF<br>TRANSPORTATION,<br><br>    Defendant. | Case No. 03-cv-4098-JPG |

**FINDINGS OF FACT AND**
**CONCLUSIONS OF LAW**

This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, in which plaintiff Wesley G. Woods ("Woods") alleges that the defendant Illinois Department of Transportation ("IDOT") retaliated against him because he engaged in activity protected by Title VII. Specifically, Woods alleges that IDOT retaliated against him because he complained orally and in writing about racial discrimination, filed a charge with the Equal Employment Opportunity Commission ("EEOC") and filed this retaliation lawsuit. The Court conducted a one-day bench trial in Benton, Illinois, on March 28, 2005. Woods was represented by Ed Dorsey, and IDOT was represented by Lisa Madigan, Attorney General for the State of Illinois, through William E. Jarvis and Thomas H. Klein, Assistant Attorneys General. Woods called himself as a witness in his case-in-chief and in rebuttal, and IDOT called Don Lingle, Karen Richardson and Greg Smothers in its case-in-chief. Pursuant to Federal Rule of Civil Procedure 52, the Court makes the following findings of fact and conclusions of law:

**FINDINGS OF FACT**

The evidence and stipulations establish the following facts:

1.    Woods was employed by IDOT from August 1980 to October 2004. Prior to 2002, he had

a spotless disciplinary record, and all his job evaluations indicated he met or exceeded job expectations.

2. At the relevant time, IDOT had a progressive disciplinary policy that went from giving an oral counseling or warning, to giving a written warning, to issuing a suspension and finally to dismissing an employee.

3. In 1987, Woods became a Design and Planning Technician III, or an Engineering Technician III, in the Operations Bureau in IDOT's Carbondale, Illinois, office.

4. In 2001, IDOT made revisions to Woods's job description to remove some duties and to add the task of preparing day labor plans and other duties.

5. A day labor plan is a description of the location, specifications and work to be performed for small-scale IDOT projects. If a day labor plan is not completed on time for a particular project, IDOT runs the risk of losing funding for that project. Don Lingle ("Lingle"), IDOT's personnel manager at the relevant time, and Karen Richardson ("Richardson"), Woods's immediate supervisor in 2001 and 2002, testified that day labor plans are usually not complex and consist of only three or four pages, although according to Greg Smothers ("Smothers"), Operations Bureau Chief and Richardson's supervisor in 2001 and 2002, they could be as many as ten to twelve pages. Both Lingle and Richardson testified that no engineering degree is required to draft a day labor plan and that prior similar plans are available to use as models. Based on her experience in 2001 and 2002 in helping Woods prepare day labor plans, Richardson testified that in 2002 Woods had the skills, experience and resources necessary to prepare day labor plans in a timely manner. She also testified that in 2002 she repeatedly offered to help him if he

needed help. Woods testified that he did not have the skills necessary to complete day labor plans without assistance. Based on the witnesses' demeanor while testifying, the specificity and clarity of Richardson's testimony, and the consistency of Richardson's, Lingle's and Smothers's assessments, the Court finds that Lingle, Richardson and Smothers were credible in their testimony on these issues.

6. On or about February 14, 2002, Woods first learned of the changes to his job description.

7. In February 2002, Woods orally complained to Richardson about the addition of duties to his job description without a commensurate increase in rank or pay. There was conflicting testimony regarding whether Woods told Richardson he thought he was assigned the additional duties because he is African-American. Woods testified that he raised the issue of race, but Richardson testified that he did not mention race at all in his oral complaint to her but instead focused solely on the lack of a pay increase or promotion. Based on the evidence and the witnesses' demeanor while testifying, the Court finds Richardson's testimony on this issue to be more credible than Woods's. Accordingly, the Court finds that in February 2002 Woods did not complain to Richardson of any race discrimination.

8. Woods received the following discipline:

   a. February 19, 2002 – counseled for being late and not calling in;

   b. February 21, 2002 – counseled for being late;

   c. June 19, 2002 – counseled for conducting union activities on state time; and

   d. July 22, 2002 – orally reprimanded for being late.

9. On July 1, 2002, Woods missed a day labor plan deadline for the first time. The day

labor plan was relatively simple. Richardson offered to help him, extended the deadline by a month and orally counseled Woods on the importance of meeting deadlines. Woods also missed the extended deadline. Richardson gave him a second extension and issued him a written warning in October 2002.

10. On August 12, 2002, Woods filed an internal written complaint of race discrimination using IDOT's discrimination reporting procedures. This was the first time Woods had expressed in any way to any IDOT personnel that he believed he was the victim of race discrimination.

11. On November 26, 2002, Woods filed an EEOC charge alleging race discrimination and retaliation.

12. On December 1, 2002, IDOT transferred Woods to IDOT's Construction Bureau to fill an Engineering Technician III position at a rock quarry that was left vacant by a retiring IDOT employee. The rock quarry position involved ensuring that the rock IDOT was provided for its roadway work was acceptable. While Woods had no experience working at a rock quarry, IDOT officials felt that he would be able to learn the job. The job was more dangerous than Woods's prior position and farther from Woods's home than the IDOT office in Carbondale.

13. After touring the rock quarry work site, Woods told his supervisor he was not interested in the job. IDOT then assigned Woods to another Construction Bureau job near Marion, Illinois, which was only about 3 miles farther from Woods's home than the Carbondale office.

14. At the Marion work site, Woods continued to receive the same salary and benefits, to

      have the same job title and to exercise some of the same skills he used in his job in the Operations Bureau. He was also allowed to drive a state vehicle to and from work. He paid for maintaining the state vehicle and reported its use as income on his taxes. His work day was 1/2 hour longer and his lunch hour was 1/2 hour shorter than they were when he worked in the Operations Bureau in IDOT's Carbondale office.

15. Woods grieved his transfer under a collective bargaining agreement. As a result, in April 2003 he was transferred back to his original position in the Operations Bureau at IDOT's Carbondale office to work under the direct supervision of Smothers.

16. After his return to the Carbondale office in April 2003, Woods failed to meet deadlines for several day labor plans. There was divergent testimony about this failure. Woods admitted that he missed some deadlines but testified that he was unable to complete the complex engineering aspects of the plans because he lacked the necessary engineering skills and no one would assist him. He testified that he requested assistance but that Smothers refused to help him. Smothers testified that initially Woods completed the plans on time but that his performance deteriorated over time until he systematically failed to meet day labor plan deadlines. He testified that he believed Woods was able but chose not to complete the plans in a timely manner. Based on the witnesses' demeanor while testifying, the Court finds that Smothers honestly believed that Woods had the capability to prepare day labor plans on time but chose not to do so.

17. On May 20, 2003, Woods filed this lawsuit.

18. Because Smothers believed Woods was intentionally not doing his job, he recommended that he be suspended. On July 16, 2003, Woods received notice that he was going to be

suspended without pay for one day. The reasons cited were that Woods failed to complete day labor plans, misused state time by taking an extended break and made an inappropriate comment to his supervisor. Woods admits that in June 2003 he referred to Smothers as an "evil man," and that doing so was disrespectful to Smothers. Ultimately, the disrespectful comment was removed as a basis for the discipline.

19. Lingle testified that IDOT's decision to suspend Woods was not based at all on his discrimination complaints but instead on his poor work performance and his history of other rules infractions. Based on the witness's demeanor while testifying and the lack of any compelling evidence to contradict his testimony, the Court finds him credible.

20. On July 22, 2003, Woods served a one-day suspension without pay. He lost approximately $150 in wages for the period of the suspension..

21. After Woods's suspension and without any further training, he completed day labor plans and his other work on time and met or exceeded IDOT's job expectations.

22. The evidence did not reveal any IDOT employee who did not complain of race discrimination and who held the same position, reported to the same supervisor, had an equivalent disciplinary history, and committed the same sort of objectionable acts as Woods who was disciplined less harshly than Woods was. Specifically, neither Bob Dover, Dave McAuley, Glenn McLernon nor Forrest Rogers are similarly situated to Woods.

**CONCLUSIONS OF LAW**

The Court has jurisdiction over this case under 28 U.S.C. §§ 1331 and 1343(a)(4). Woods brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e *et seq*. Title VII forbids an employer to retaliate against an employee because he has "opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a); *Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 269 (2001) (*per curiam*). In order to prevail on a claim for retaliation under Title VII, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered an adverse action, and (3) there is a causal link between the protected expression and the adverse action. *Tart v. Illinois Power Co.*, 366 F.3d 461, 476 (7th Cir. 2004) (citing *Spearman v. Ford Motor Co.*, 231 F.3d 1080, 1086 (7th Cir. 2000)).

    A.    <u>Statutorily Protected Activity</u>

A Title VII retaliation plaintiff must establish that he participated in a statutorily protected activity. Woods engaged in statutorily protected activity when he: (1) filed a formal internal complaint in August 2002 complaining for the first time of race discrimination, (2) filed an EEOC charge in November 2002 and (3) filed this lawsuit in May 2003. However, Woods's informal complaint to Richardson in February 2002 did not constitute statutorily protected activity. A complaint is not protected under Title VII if it does not involve opposition to race discrimination or some other forbidden practice. *See Gallagher v. Kleinwort Benson Gov't Sec., Inc.*, 698 F. Supp. 1401, 1406 (N.D. Ill. 1988) (finding that employee's complaints of dissatisfaction with salary were not protected activity because they did not complain of unlawful discrimination). Woods's informal complaint to Richardson focused solely on his unhappiness with additional job duties without any pay or rank increase. He did not complain of race discrimination or any other practice made unlawful by Title VII, and there was no evidence

7

showing that IDOT inferred such a reason for Woods's complaint. Therefore, his oral complaint is not a protected activity, and any treatment he received subsequent to that complaint could not have been in retaliation for it.

      B.     <u>Adverse Action</u>

A Title VII retaliation plaintiff must also establish that he suffered an adverse employment action. The Court focuses its inquiry on the actions taken after Woods's first statutorily protected activity, his August 2002 internal complaint, because actions taken before that time could not have been in retaliation for protected activity that had not happened yet.

In order to establish an adverse employment action as that phrase is understood in the Title VII discrimination context, a plaintiff must show a "quantitative or qualitative change in the terms or conditions of his employment that is more than a mere subjective preference." *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir.), *cert. denied*, 540 U.S. 1004 (2003); *see Herrnreiter v. Chicago Housing Auth.*, 315 F.3d 742, 744-45 (7th Cir. 2002), *cert. denied*, 540 U.S. 984 (2003). Adverse employment actions generally fall into three categories.

> (1) cases in which the employee's compensation, benefits or other financial terms of employment are diminished, including cases where employment is terminated; (2) cases in which a nominally lateral transfer without a change in financial terms significantly reduces the employee's career prospects by preventing him from using the skills in which he is trained and experienced; and (3) "[c]ases in which the employee is not moved to a different job or the skill requirements of his present job altered, but the *conditions* in which he works are changed in a way that subjects him to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in his workplace environment – an alteration that can fairly be characterized as objectively creating a hardship, the classic case being that of the employee whose desk is moved into a closet."

*Tart v. Illinois Power Co.*, 366 F.3d 461, 475 (7th Cir. 2004) (quoting *Herrnreiter*, 315 F.3d at 744-45) (emphasis in original).

However, "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001) (internal quotations, citations and ellipsis omitted). Actions that do not significantly affect a plaintiff's job responsibilities or benefits, or actions that cause mere inconveniences, cannot be tangible employment actions. *Id*.

In the retaliation context, the law is not as demanding as it is in the discrimination context. The adverse action necessary to establish retaliation need not be an *employment* action. *Herrnreiter*, 315 F.3d at 745-46 (citing *McDonnell v. Cisneros*, 84 F.3d 256, 258-59 (7th Cir. 1996)). Some Seventh Circuit opinions suggest that an employment action that falls short of the type of action required to support a discrimination claim may suffice for a retaliation claim. *Herrnreiter*, 315 F.3d at 746 (noting conflict among Seventh Circuit opinions). Nevertheless, the action must still be something the employer does that causes the employee to suffer a real harm. *Johnson*, 325 F.3d at 902.

There was no evidence that any adverse treatment Woods received during his daily work activities after his August 2002 internal complaint amounted to a significant change in the terms and conditions of his employment such that it would be an actionable adverse action.

Likewise, Woods's proposed transfer to the rock quarry and actual transfer to the Construction Bureau site near Marion for four months did not cause him to suffer a real harm. They were therefore not actionable adverse actions. The proposed transfer to the rock quarry never materialized. Even if it had, the rock quarry job, although involving different sorts of tasks and a longer commute, was at the same job level as Woods's Operations Bureau job, an

Engineering Technician III, and would not have reduced his career prospects or significantly negatively affect the terms or conditions of Woods's employment so as cause him real harm.

As for the actual transfer to the Marion worksite, it did not change Woods's salary, benefits or rank. It allowed him to use the skills he had acquired in his history working with IDOT, and there was no evidence that the transfer affected his career prospects. The slight modifications in the length of his commute and in his working hours, along with the unspecified cost Woods paid to maintain his state vehicle or paid in taxes for the use of the vehicle, while possibly inconveniencing Woods, were not so significant that the Court can say they caused him to suffer the sort of real harm that Title VII was designed to prevent.

Woods's July 2003 suspension was an adverse employment action because it caused him to suffer a real harm and was, for at least one day, a quantitative change in the terms or conditions of his employment that was more than a mere subjective preference. *Johnson*, 325 F.3d at 901.

C.   Causal Link

A Title VII retaliation plaintiff must also establish that the adverse employment action he suffered was caused by his statutorily protected activity. Based on the evidence, the Court finds that IDOT suspended Woods because Woods had an established history of not completing day labor plans on time and had committed other rules infractions, not because he engaged in protected activity. Woods's supervisor believed he was shirking tasks he was able to do, which certainly was sufficient to support taking disciplinary action. Furthermore, the discipline selected, a one-day suspension, was a part of a progressive disciplinary course for the day labor plan deficiency and took into consideration Woods's prior history of tardiness and other rule

infractions. The Court also notes that there was no evidence of a similarly situated IDOT employee who had not engaged in protected activity who was treated better or differently than Woods was for the same sorts of deficiencies. Woods's protected activities simply did not motivate IDOT, in whole or in part, to suspend Woods, and it is clear that IDOT would have suspended Woods even if he had not engaged in protected activities.[1]

The temporal connection between the filing of this lawsuit on May 20, 2003, and the suspension that was doled out on July 16, 2003, does not convince the Court otherwise. It is true that a causal connection may be established by a telling temporal sequence where an adverse action follows "fairly soon" after or is "very close" in time to a statutorily protected activity. *See Clark Co. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (*per curiam*); *Sweeney v. West*, 149 F.3d 550, 557 (7th Cir. 1998). However, in light of IDOT's witnesses' consistent, reasonable and credible explanations of the reasons underlying the decision to suspend Woods, the significance of the two-month period between the commencement of this action and the suspension (and the even longer periods between Woods's other protected activities and his suspension) nearly vanishes.

---

[1] The Court further finds that even if Woods's proposed transfer to the rock quarry and actual transfer to the Marion worksite had amounted to actionable adverse actions, the evidence did not establish that the proposed or actual transfer was motivated, in whole or in part, by Wood's protected activities. The preponderance of the evidence established that IDOT sought to transfer Woods because the rock quarry position needed to be filled, Woods was qualified for the job, and Woods was having trouble accomplishing his day labor plan responsibilities in his Carbondale position.

## **CONCLUSION**

**IT IS THEREFORE ORDERED** that judgment be entered in favor of defendant IDOT and against plaintiff Wesley G. Woods.  The Court **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  May 31, 2005**

                                            s/ J. Phil Gilbert
                                            **J. PHIL GILBERT**
                                            **DISTRICT JUDGE**